UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 20 cr 10007 |
| | ) | |
| v. | ) | Violations: |
| | ) | |
| (1) FRANK APICELLA, | ) | Count One: Conspiracy to Defraud the |
| (2) MICHAEL SFORZA, and | ) | United States (18 U.S.C. § 371) |
| (3) JAMES APICELLA, | ) | |
| | ) | Count Two: Mail Fraud; Aiding and |
| Defendants | ) | Abetting (18 U.S.C. §§ 1341 and 2) |
| | ) | |
| | ) | Forfeiture Allegation: |
| | ) | (18 U.S.C. § 981 and 28 U.S.C. § 2461) |
| | ) | |

INFORMATION

At times relevant to this Information:

GENERAL ALLEGATIONS

1.     Defendant FRANK APICELLA was an individual who resided in Groveland, Massachusetts. FRANK APICELLA never served in the United States military and was not a military veteran.

2.     Defendant MICHAEL SFORZA was an individual who resided in Alpharetta, Georgia. MICHAEL SFORZA never served in the United States military and was not a military veteran.

3.     Defendant JAMES APICELLA was an individual who resided in: Groveland, Massachusetts; Haverhill, Massachusetts; and Kingston, New Hampshire. JAMES APICELLA served in the United Sates Marine Corps and was classified as a service-disabled veteran, with a 10% disability rating, by the the United States Department of Veteran's Affairs. JAMES APICELLA's father was FRANK APICELLA.

1

4.      FENS Associates, LLC ("FENS") was a Massachusetts company that specialized in selling furniture and installation services to government purchasers. FENS was owned and managed by FRANK APICELLA and MICHAEL SFORZA, and maintained its principal place of business in Groveland, Massachusetts. At no point has FENS ever qualified as a service-disabled veteran-owned small business ("SDVOSB") or historically underutilized business zone ("HUBZone") entity.

5.      Tactical Office Solutions ("Tactical"), was a Massachusetts company established in or about 2007. From early 2011 on, Tactical was more than 75% owned by JAMES APICELLA. APICELLA represented Tactical to be a SDVOSB and HUBZone program eligible entity.

6.      The United States Department of Veteran's Affairs ("VA") was the federal government agency charged with serving America's veterans and their families and ensuring they receive medical care, benefits, and social support promoting the health, welfare and dignity of veterans in recognition of their service to the United States.

7.      The Center for Verification and Evaluation ("CVE"), formerly known as the Center for Veteran Enterprise, was a subdivision of the VA's Office of Small and Disadvantaged Business Utilization. The CVE evaluated and verified SDVOSB eligibility and maintained a list of eligible firms.

8.      The United States General Services Administration ("GSA") was a federal government contracting agency responsible for supplying federal purchasers with products and services from commercial vendors. The GSA housed the System for Award Management ("SAM") where contractors entered and certified details of their company. Government agency contracting offices – including the GSA, VA, and Army – relied on SAM to award contracts and

2

determine eligibility for federal programs such as the SDVOSB Program.

9.      The United States Army (the "Army") is an agency of the United States within the Department of Defense.

10.     The United States Small Business Administration ("SBA") was an independent agency of the federal government, charged with the responsibility to aid, counsel, assist, and protect the interests of small business concerns, to preserve free competitive enterprise, and to maintain and strengthen the overall economy of the United States.

11.     The SBA is responsible for the HUBZone program which was an incentive for small companies that employ people in historically underutilized business zones. The HUBZone program helps small businesses in urban and rural communities gain preferential access to federal procurement opportunities.

12.     The United States seeks to promote small businesses by creating government contract opportunities (set-aside contracts) that are only available to qualifying companies, such as: (a) small businesses; (b) SDVOSBs; and (c) HUBZone businesses.

<u>The SDVOSB Program and Eligibility Requirements</u>

13.     The Veterans Entrepreneurship and Small Business Development Act of 1999 established an annual government-wide goal of awarding contracts to at least three percent of the total value of all federal prime and subcontract awards for small business concerns owned and controlled by service-disabled veterans. The Veterans Benefits Act of 2003 added a contracting mechanism to enable agencies to reach this three percent goal. This was primarily accomplished through a set-aside program, run by the SBA, where competition for certain contracts was restricted to certain SDVOSBs.

3

14.     To be eligible for the SDVOSB program, a service-disabled veteran was required to meet the following criteria:

      a.  Have a service-connected disability determined by the VA or Department of Defense;

      b.  Unconditionally own 51% of profits and/or the annual distribution profits paid on the stock for the SDVOSB;

      c.  Control the day-to-day management, daily operations, and long-term decision making of the SDVOSB;

      d.  Hold the highest officer position in the SDVOSB;

      e.  Have managerial experience of the extent and complexity needed to run the SDVOSB;

      f.  In the case of a corporation, control the board of directors; and

      g.  Devote full-time work to the business during normal working hours.

15.     The SDVOSB regulations state that a non-veteran or entity may be considered to control or have the power to control an SDVOSB if a non-veteran has an equity interest in the company or provides critical financial or bonding support for the company which directly or indirectly allows the non-veteran significantly to influence business decisions of the SDVOSB.

16.     The SDVOSB regulations further provide that a non-veteran may be found to control a SDVOSB where a business relationship exists with a non-veteran or entity that causes such dependence that the SDVOSB cannot exercise independent business judgment without great economic risk.

## The HUBZone Program and Eligibility Requirements

17.     To be eligible for HUBZone designation, a business must meet the following criteria:

   a.  Be a small business based on the North American Industry Classification System for size standards;

   b.  Be at least 51% owned and controlled by U.S. Citizens, or a Community Development Corporation, an agricultural cooperative, a Native Hawaiian organization, or an Indian tribe;

   c.  Have and maintain a principal office in a designated HUBZone; and

   d.  Have at least 35% of its employees reside in a designated HUBZone.

18.     A business's principal office is defined as the location where the greatest number of employees at any one location perform their work.

## Overview of the Conspiracy and Scheme to Defraud

19.     Beginning in or about 2011, FRANK APICELLA, JAMES APICELLA, and MICHAEL SFORZA engaged in a scheme to defraud the United States by, among other things, falsely representing Tactical as a SDVOSB and a HUBZone company and then using Tactical to bid for, and obtain, government contract work that was set aside for SDVOSBs and HUBZone companies. After obtaining the contracts, the work was actually performed by FENS and other companies that did not qualify as SDVOSBs and HUBZone companies.

## Object and Purpose of the Conspiracy and Scheme to Defraud

20.     It was the object and purpose of the conspiracy and the scheme to defraud for Defendants and their employees to unjustly enrich themselves by (1) fraudulently representing

Tactical as an independent company that was an eligible SDVOSB and HUBZone participant and that met other requirements to qualify for, and obtain, government contracts, including from the VA and the Army; and (2) using Tactical's name and status to bid, on behalf of FENS and other companies, contracts that were reserved for SDVOSBs and HUBZone companies.

<u>Manner and Means of the Conspiracy and Scheme to Defraud</u>

21.     Among the manner and means by which Defendants and coconspirators known and unknown to the United States Attorney carried out the conspiracy and the scheme to defraud were the following:

      a. Falsely misrepresenting Tactical to be an SDVOSB in order to obtain government contracts to which it was not entitled;

      b. Falsely misrepresenting Tactical to be eligible for HUBZone status in order to obtain government contracts to which it was not entitled;

      c. Falsely portraying Tactical and FENS as separate and distinct companies when in fact FENS employees: negotiated furniture dealership arrangements on behalf of Tactical, bid for jobs on behalf of Tactical, designed projects that were awarded to Tactical, installed projects that were awarded to Tactical, managed projects that were awarded to Tactical, secured bonding on behalf of Tactical, and provided the office space from which JAMES APICELLA and Tactical did business;

      d. Using Tactical as a pass-through entity to funnel government contracts to other established companies, which did not qualify as SDVOSBs or HUBZone companies.

Acts in Furtherance of the Conspiracy and Scheme to Defraud

22.     Defendants and conconspirators known and unknown to the United States Attorney committed and caused to be committed the following acts in furtherance of the conspiracy, among others.

False Representations as to SDVOSB Status

23.     From June 2010 to March 2018, Tactical falsely self-certified as a SDVOSB with GSA through SAM. The false certification with GSA allowed Tactical to secure SDVOSB set-aside contracts with various federal agencies.

24.     For instance, on or about May 29, 2014, in response to questions posed by CVE, JAMES APICELLA falsely represented to CVE, among other things, that: (1) Tactical and FENS "do not share facilities, equipment or employees"; and (2) when Tactical subcontracted to FENS, the transactions were "arms length engagements" for which "upon receipt by Tactical from FENS of an invoice for services rendered, Tactical makes payment to FENS [for] the amount due."

25.     In addition, on or about July 1, 2016, in response to a notice of cancellation from the CVE, JAMES APICELLA falsely represented to CVE, among other things, that:

   a.   he wholly controlled Tactical;

   b.   Tactical and FENS competed for projects;

   c.   Tactical and FENS did "not share facilities, equipment or employees";

   d.   Tactical's "primary location" was in Haverhill, Massachusetts;

   e.   nobody at FENS, including FRANK APICELLA, had ever had the ability or
        authority to make any business or financial decisions for Tactical;

   f.   Tactical and FENS operated independently of each other; and

g. There were no shared contracts, financials, equipment, employees, or controls between Tactical and FENS.

26.    By means of these false representations, Defendants prevented CVE from decertifying Tactical as an SDVOSB in July 2016.

False Representations of HUBZone Eligibility

27.    On or about March 29, 2011, JAMES APICELLA falsely certified in an application for HUBZone status that he controlled Tactical, and that Tactical's principal office was in Haverhill, Massachusetts, which is a HUBZone.

28.    On or about May 16, 2011, in response to an inquiry from the SBA, JAMES APICELLA falsely certified that his condominium in Haverhill "serve[d] as the principal office for Tactical" and that he did "not have other offices associated with Tactical."

29.    On or about April 6, 2015, JAMES APICELLA sent a HUBZone recertification package by Federal Express from Haverhill, Massachusetts to the HUBZone recertification unit of the SBA in Washington, D.C. In this package, he falsely certified to the SBA that Tactical's principal office was located in a HUBZone, when in reality, he mainly worked out of the FENS office in Groveland, Massachusetts, which was not HUBZone eligible. Tactical's only other employee, whose employment began in or about December 2014, also worked in the Groveland, Massachusetts office.

30.    By means of these false representations, Defendants caused the SBA to approve Tactical's application for HUBZone status in 2011 and recertify that status in 2015.

8

<u>Fraudulently Obtained Awards</u>

31.     As a result of the above-described conspiracy and scheme to defraud, Defendants successfully obtained millions of dollars in federal contracts to supply furniture to federal government agencies based upon the SDVOSB and HUBZone designations.  From in or about January 2012 through December 2017, Tactical received approximately $16 million in SDVOSB and HUBZone contract awards.   The following are some examples of improperly obtained government contracts.

<u>Fort Bragg Project</u>

32.     In or about 2014, MICHAEL SFORZA submitted an initial proposal to a general contractor ("Company A"), on behalf of FENS to perform furniture installation as part of a government contract for a project located in Fort Bragg, North Carolina.  Company A was the prime contractor to the U.S. Army Corps of Engineers under Army contract W91278-11-D-0073.

33.     Company A informed MICHAEL SFORZA that it would not award the subcontract for the Fort Bragg contract to FENS because Company A had to meet small disadvantaged business goals.  In response, MICHAEL SFORZA informed Company A that FENS had a "sister-company," Tactical, which was a HUBzone and SDVOSB and thus could fulfill Company A's small disadvantaged business goals.

34.     Subsequently, MICHAEL SFORZA resubmitted the FENS proposal to Company A on Tactical letterhead. The proposal itself was unchanged except for the name.

35.     In or about February 2015, based upon Tactical's certifications that it was both a SDVOSB and HUBzone participant, Company A awarded it a $1,740,000 subcontract to deliver and install all furniture, fixtures, and equipment at the SOF Battalion Operations Center at Ft.

9

Bragg, NC (the "Ft. Bragg Project").

36.    In fact, MICHAEL SFORZA of FENS served as the primary point of contact on behalf of Tactical with Company A during the performance of the contract and identified a FENS employee as Tactical's contract administrator for Company A for the Ft. Bragg Project.

37.    Company A required subcontractors like Tactical to self-certify any claims of SDVOSB or HUBZone status. In its submission, Tactical not only certified that it was an SDVOSB and a HUBZone entity, but also falsely reported that it had six employees.

38.    On or about February 5, 2015, MICHAEL SFORZA sent an email to a project manager for Company A stating that "[s]ince this project is running thru [Tactical] and not FENS we will be responding in the future via Tactical email correspondence."

39.    In or about September 2015, FENS asked Company B, a furniture manufacturer, for a rebate relating to the Ft. Bragg Project based on the fact that FENS was actually doing the work. In processing that request, a Company B representative explained that: "[Tactical] had nothing to do with the order other than having the socioeconomic status that the [General Contractor] wanted. FENS would like this order credited to [them] because they did all the work but [Tactical] was needed as an order conduit."

40.    In or about fall 2015, because Tactical was unable to obtain a bond on its own merits, MICHAEL SFORZA and FRANK APICELLA used FENS bonding and guarantee capacity in order to obtain a "dual obligee" bond on behalf of Tactical for the Ft. Bragg Project.

<u>Bedford VA Project</u>

41.    On or about September 22, 2016, JAMES APICELLA and FRANK APICELLA caused a FENS employee to submit a bid of $211,128 purportedly on behalf of Tactical to the

VA for a SDVOSB set-aside contract for the delivery and installation of sit-stand desks at the Bedford VA Medical Facility (the "Bedford contract"). Tactical was awarded the Bedford contract.

42.     At various dates in the fall of 2016, JAMES APICELLA and FRANK APICELLA caused FENS employees to perform work in connection with the Bedford contract, including by carrying out contract negotiations, ordering the furniture, arranging for delivery of the desks, and delivering the desks.

Overt Acts in Furtherance of the Conspiracy

43.     In furtherance of the conspiracy and to accomplish its objectives, the following overt acts, among others, were committed by the defendants in the District of Massachusetts, and elsewhere:

a. On or about February 5, 2015, MICHAEL SFORZA sent an email to a project manager for Company A stating that "[s]ince this project is running thru [Tactical] and not FENS we will be responding in the future via Tactical email correspondence."

b. On or about April 6, 2015, JAMES APICELLA sent a recertification package to the SBA HubZone Recertiifcaiton Unit which contained a false certification that Tactical's principal office was located in a HUBZone.

c. In or about Fall 2015, MICHAEL SFORZA and FRANK APICELLA obtained a "dual obligee" bond on behalf of Tactical for the Fort Bragg project.

11

<u>COUNT ONE</u>
Conspiracy
(18 U.S.C. § 371)

The United States Attorney charges:

44.     The United States re-alleges and incorporates by reference paragraphs 1 through 43 of this Information.

45.     From in or about 2010 through in or about at least 2018, in the District of Massachusetts, and elsewhere, the defendants,

        (1)    FRANK APICELLA
        (2)    MICHAEL SFORZA, and
        (3)    JAMES APICELLA,

did conspire, combine, confederate, and agree together and with each other and with other individuals known and unknown to the United States Attorney to defraud the United States and any agency thereof for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of United States agencies, including the VA, the GSA, and the Army, in the implementation, execution, and administration of the SDVOSB and HUBZone programs.

In violation of Title 18, United States Code, Section 371.

COUNT TWO
Mail Fraud; Aiding and Abetting
(18 U.S.C. §§ 1341 and 2)

The United States Attorney further charges:

46.     The United States Attorney re-alleges and incorporates by reference paragraphs 1-43 of this Information.

47.     On or about April 5, 2016, in the District of Massachusetts, and elsewhere, the defendants,

(1)     FRANK APICELLA
(2)     MICHAEL SFORZA, and
(3)     JAMES APICELLA,

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, did, for the purpose of executing and attempting to execute the scheme, deposit and cause to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier and take and receive therefrom, any such matter and thing including, the following:

| Approximate Date | Mailing |
|---|---|
| April 6, 2015 | HUBZone recertification package from Haverhill, MA to the Small Business Administration in Washington, DC |

In violation of Title 18, United States Code, Sections 1341 and 2.

13

## FORFEITURE ALLEGATION
### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

48.     Upon conviction of the offense in violation of Count Two, the defendants,

        (1)     FRANK APICELLA
        (2)     MICHAEL SFORZA, and
        (3)     JAMES APICELLA,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited by

the defendants includes, but is not limited to, the following: the sum of at least $300,000 each,

which represents the proceeds derived from the defendants' violation.

49.     If any of the property described in Paragraph 48, above, as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendant --

        a.  cannot be located upon the exercise of due diligence;

        b.  has been transferred or sold to, or deposited with, a third party;

        c.  has been placed beyond the jurisdiction of the Court;

        d.  has been substantially diminished in value; or

        e.  has been commingled with other property which cannot be divided without
            difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendant up to the value of the property described in Paragraph 48 above.

14

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

ANDREW E. LELLING
UNITED STATES ATTORNEY

Sara Miron Bloom
Annapurna Balakrishna
Assistant United States Attorneys

Date: 1/10/2020

15